In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4222

Louvenia Hall,

Plaintiff-Appellant,

v.

Bodine Electric Company,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 8050--Charles P. Kocoras, Judge.

Argued September 7, 2001--Decided January 8, 2002

Before Bauer, Easterbrook, and Manion,
Circuit Judges.

Manion, Circuit Judge.  Louvenia Hall
sued her former employer, Bodine Electric
Company, alleging that the company
violated Title VII by discriminating
against her on the basis of sex with
respect to its training and promotion
practices, subjected her to hostile
environment sexual harassment, and
retaliated against her for reporting the
harassment. Bodine moved for summary
judgment, which the district court
granted. Hall appeals the decision, and
we affirm.

I.

Louvenia Hall worked as a machine
operator at Bodine Electric Company from
September 9, 1994 until June 14, 1999.
Bodine manufactures small motors for a
variety of machines requiring a quiet
power source for repetitive motors. Hall
operated a grinding machine (a machine
that smooths parts) and a hobbing machine
(a machine that cuts teeth into gears) in
the company's gearing/hobbing department
("gearing cell").

Shortly after she began working at
Bodine, Hall claims that her supervisor,
Steve Conn, refused to provide her with
orientation training, and that she only

received the training after complaining to his superior. She contends that this incident was merely the beginning of a pattern of discrimination against her by Bodine when it came to training opportunities for advanced positions in the company./1 Hall alleges that Bodine gave preferential treatment to its male employees when training opportunities for advanced positions became available, and refused to train her for these positions solely because of her gender.

Hall also alleges that Bodine subjected her to a hostile environment of sexual harassment. On June 8, 1999, Hall came to work wearing a sleeveless blouse with a sleeveless t-shirt on underneath--she did not have on a brassiere. Later that day, Hall was speaking with Samuel Lopez and Douglas Benson, two of her co-workers, when Lopez suddenly reached over and pulled her blouse and t-shirt from her body, thereby exposing her breast. Lopez then held out his thumb and exclaimed, "Her nipples is this damn big!" Hall attempted to strike Lopez, but he ran away from her. She then went looking for her supervisor, Brian Kolka, to inform him of what had just occurred. By the time Hall found him, a company meeting was about to begin, and, before she could say anything, Kolka requested that they speak at a later time. The meeting lasted until the end of the workday, and Hall went home without informing Kolka of Lopez's harassment.

The next morning, tensions ran high in the gearing cell. Lopez, one of the cell's "set-up operators,"/2 assigned Hall to operate a specific machine, but she angrily refused to comply with his directive. Lopez informed Kolka of Hall's refusal, and Kolka immediately arranged a meeting between the three of them to address the matter. From the outset of the meeting, Kolka sensed the "vitriol" between Hall and Lopez, and attempted to facilitate a constructive dialogue to ascertain the underlying problem. When Lopez and Hall refused to stop interrupting one another, Kolka decided to end the meeting. Before doing so, however, he told Hall that Lopez, as a set-up operator, had the authority to assign her to any machine in the gearing cell, and that she was required to follow his instructions. The meeting ended after Hall agreed to comply with Lopez's

instructions in the future. Neither Hall nor Lopez mentioned the previous day's incident during this meeting.

   At the conclusion of the meeting, Hall went to the human resources department to file a complaint against Lopez for sexual harassment. She met with Kolka and Mike Metz, Bodine's human resources manager, and related to them what Lopez had done to her the previous day. Kolka and Metz then called Rich Meserve, Bodine's vice president of human resources, into the meeting, and requested that Hall repeat the allegations of her complaint for his benefit. She did so and also informed them, for the first time, of other occasions where Lopez had sexually harassed her. Hall told them that, on approximately eight or nine occasions in October or November of 1998, Lopez rubbed a small rubber ball with spikes on the back of her neck in an effort to make her "nipples stick out." She also claimed that Lopez often made inappropriate sexual comments in her presence. When Hall finished recounting these incidents, Meserve thanked her for apprising the company of the conduct, informed her that an investigation would be commenced immediately, and told her that she could return to work. After telling him that she was too upset to work, Meserve gave Hall the remainder of the day off with pay. Meserve then assigned Metz to conduct an investigation of Hall's complaint, instructing him to begin the process immediately by interviewing Lopez. Meserve told Metz that after he interviewed Lopez he was to advise him of his suspension, pending the outcome of the investigation. Metz interviewed Lopez later that day, afterwards informing him of the suspension. The following day, Lopez filed a "counter claim" of harassment against Hall, alleging that she grabbed his buttocks and made graphic sexual comments/ gestures about male genitalia. Bodine responded to Lopez's complaint by suspending Hall, and expanding Metz's investigation to encompass both complaints.

   Metz interviewed eighteen people, including Lopez and Hall, during the course of his investigation. He spoke with every individual that Lopez and Hall identified as a potential witness, and a few others that he determined might have been stationed in the proximity of the

alleged conduct. Metz made handwritten notes during these interviews, but shredded them after typing them into his computer at the conclusion of each day of the investigation. Based on the information he discovered during the investigation, Metz concluded that Lopez and Hall had both violated Bodine's workplace rules prohibiting sexual harassment. Metz reported his findings and conclusions to Meserve who then made the decision, on June 14, 1999, to terminate both employees.

On June 11, 1999, three days prior to her termination, Hall filed charges with the EEOC alleging that Bodine discriminated against her on the basis of her sex, subjected her to hostile environment sexual harassment, and retaliated against her for complaining of the discriminatory treatment and harassment. Hall filed a second EEOC complaint on June 18, 1999, alleging that Bodine fired her in retaliation for reporting Lopez's sexual harassment and because of her gender. After receiving her right-to-sue letters, Hall initiated the underlying civil action against Bodine, suing the company under Title VII for sex discrimination, hostile environment sexual harassment, and retaliatory discharge. The district court granted Bodine's motion for summary judgment on all three claims. Hall appeals the decision.

II.

We review de novo the district court's decision to grant summary judgment, construing all facts, and drawing all reasonable inferences from those facts, in favor of Hall, the non-moving party. Warsco v. Preferred Technical Group, 258 F.3d 557, 563 (7th Cir. 2001). Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

A. Hall's Claim of Sex Discrimination

Hall alleges that Bodine discriminated against her on the basis of her sex, in violation of Title VII, by refusing to train her for advanced positions in the company, and by giving preferential treatment to male employees, with less

seniority and experience, when these jobs became available.

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. sec. 2000e-2(a)(1). In Illinois, an individual must initiate a sex discrimination claim by filing an EEOC charge within 300 days of the alleged discrimination. See Shanoff v. Illinois Dept. of Human Services, 258 F.3d 696, 701 (7th Cir. 2001). Failure to do so bars litigation over those claims. Speer v. Rand McNally & Co., 123 F.3d 658, 662 (7th Cir. 1997); 42 U.S.C. sec. 2000e-5(e) (prescribing limitations period for discrimination charges). The 300-day time period for Hall to file her sex discrimination claim excludes any alleged discriminatory acts occurring before August 15, 1998. All of the specific incidents of failure to train and promote, forming the basis of Hall's sex discrimination claim, occurred well outside of this statutory time period, and therefore she relies on the "continuing violation" doctrine to maintain the viability of her claim.

The continuing violation doctrine allows a Title VII plaintiff to get relief for time-barred acts by linking them with acts occurring within the limitations period. See, e.g., Shanoff, 258 F.3d at 703; Miller v. American Family Mut. Ins. Co., 203 F.3d 997, 1003-04 (7th Cir. 2000). When this takes place, we treat the combination of acts as "'one continuous act that ends within the limitations period.'" Shanoff, 258 F.3d at 703 (citation omitted). Pre-limitations period conduct does not become actionable, however, merely because a plaintiff brings a timely suit on a limitations period violation. A plaintiff "may not base her . . . suit on conduct that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct . . . ." Galloway v. Gen. Motors Serv. Parts Operations, 78 F.3d 1164, 1167 (7th Cir. 1996). She may, however, do so in a case where "the conduct could constitute, or be recognized, as

actionable harassment only in the light of events that occurred later, within the period of the statute of limitations." Id. The doctrine may also apply "when, after an initial incident of discrimination, a plaintiff does not feel 'sufficient distress to . . . mak[e] a federal case.'" Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 344 (7th Cir. 1999) (citation omitted).

The district court concluded that Hall could not utilize the continuing violation doctrine because she: (1) offered no evidence that a discriminatory action had been taken against her during the limitations period, and (2) did not demonstrate, or for that matter even argue, that she reasonably failed to perceive the pre-limitations period conduct as discriminatory, or as sufficiently severe enough to warrant remedial action on her part. Hall argues on appeal, however, that neither of these facts precludes her from invoking the continuing violation doctrine because her case falls within the ambit of this court's decision in Freeman v. Madison Metro. School Dist., 231 F.3d 374 (7th Cir. 2000),/3 a case where the doctrine applied. In Freeman, the plaintiff brought a Title VII race discrimination claim against his former employer alleging that, after suffering a work-re lated injury, the employer refused to modify his job duties to accommodate his new physical limitations, even though it had previously provided similar accommodations to white employees. Id. at 376. We held that the district court erred in precluding Freeman from using the continuing violation doctrine "[b]ecause at least some of the decisions delaying his return to work were made within the limitations period," id. at 381, and his employer's pre-limitations period conduct could have reasonably been perceived as expressing a willingness to accommodate his disability. Id. Therefore, "only with the benefit of hindsight, after the series of discriminatory acts, could Freeman have realized he was the victim of unlawful discrimination." Id.

The facts of this case are entirely different from those in Freeman. First, unlike Freeman, Hall has failed to identify any discriminatory conduct on the part of Bodine during the limitations

period of her case. Requiring plaintiffs to identify a limitations period violation is necessary to enable courts to distinguish an ongoing pattern of discrimination from non-actionable situations involving the "persisting effects of past discrimination." Freeman, 231 F.3d at 381. Additionally, by her own admission, Hall was on notice of the alleged discriminatory conduct well in advance of the limitations period. As early as 1994, she regularly complained to supervisors that she was not receiving advanced training./4 Hall argues, however, that her awareness of the alleged discrimination is irrelevant because Bodine, like the employer in Freeman, promised to eventually train her, and, therefore, she should not be penalized for relying on such promises. We find this argument unpersuasive. There is simply nothing in the record to support Hall's contention that she was justified in waiting until June 1999 to complain about Bodine's alleged refusal to train her. Whatever claim she may have had against Bodine, she lost it by failing to file a complaint within the time allowed by Title VII. See, e.g., EEOC v. North Gibson School Corp., 266 F.3d 607, 617 (7th Cir. 2001) ("the continuing violation doctrine does not apply when a time-barred incident cannot be linked with an incident that occurred within the statutory period or when the time-barred incident alone should have triggered the plaintiff's awareness that [her] rights had been violated.") (citation omitted).

Without the time-barred conduct, the only evidence left to support Hall's claim is an affidavit where she asserts that "[d]uring the entire time that I worked for Bodine I was subjected to discriminatory treatment due to my gender, female, on a continuing basis." It is well settled that conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact. See, e.g., Patterson v. Chicago Ass'n for Retarded Citizens, 150 F.3d 719, 724 (7th Cir. 1998). We, therefore, conclude that the district court's decision to grant Bodine's motion for summary judgment of this claim was proper.

B. Hall's Claim of Sexual Harassment

Hall also alleges that Bodine violated Title VII by subjecting her to a hostile work environment. In order to establish a prima facie case of hostile environment sexual harassment, a plaintiff must demonstrate that: "(1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on [the individual's] sex; (3) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability." Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1032 (7th Cir. 1998) (citations omitted). We begin with the fourth element because, as explained below, Hall has failed to establish a basis for employer liability, and therefore cannot prevail on her claim.

An employer's liability for hostile environment sexual harassment hinges on whether the harasser is the victim's supervisor or merely a co-employee. Parkins, 163 F.3d at 1032. "'An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.'" Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 745 (1998)). In Parkins, we held

it is manifest that the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes [of] imputing liability to the employer.

Id. at 1034.

In this case, Hall argues that her harasser, Lopez, qualifies as a Title VII supervisor because he: (1) possessed the authority to direct her work operations (i.e., which machines she ran); (2)

provided input into her performance evaluations, and (3) was charged with training her and other less experienced employees./5 Accepting these attributes as true, as we are required to do in the summary judgment context, none of them is enough to bring Lopez within the definition of a Title VII supervisor--as there is nothing in the record indicating that Bodine entrusted him with the authority to "hire, fire, demote, promote, transfer, or discipline" Hall.

Moreover, the fact that an employer authorizes one employee to oversee aspects of another employee's job performance does not establish a Title VII supervisory relationship. An individual is not a supervisor unless he possesses the authority to directly affect the terms and conditions of a victim's employment. See, e.g., Haugerud v. Amery School Dist., 259 F.3d 678, 696–97 (7th Cir. 2001) (employer may only be held vicariously liable for the acts of those who can be considered the employer's proxy--an individual holding a sufficiently high position in the management hierarchy of the company). The type of marginal discretion Lopez had over Hall's work operations is not sufficient to impute Title VII vicarious liability to an employer. See, e.g., Parkins, 163 F.3d at 1034. Additionally, Hall's own actions indicate that she never considered Lopez to be her supervisor. Whenever she had a complaint, she spoke with her actual supervisor (i.e., Steve Conn or Brian Kolka) or the human resources department, not with Lopez or anyone else in his capacity./6

Because Lopez was not Hall's supervisor, Bodine is liable for his conduct only if the company was "'negligent either in discovering or remedying the harassment.'" Parkins, 163 F.3d at 1032 (citations omitted); see also Berry v. Delta Airlines, Inc., 260 F.3d 803, 811 (7th Cir. 2001); Haugerud, 259 F.3d at 696-97. An employer's legal duty in co-employee harassment cases "will be discharged if it takes 'reasonable steps to discover and rectify acts of sexual harassment by its employees.'" Parkins, 163 F.3d at 1032 (citations omitted); see also Berry, 260 F.3d at 811. Title VII neither requires nor expects the management of a company to be aware of every impropriety committed by every low-level employee.

Parkins, 163 F.3d at 1035. Therefore, "notice or knowledge of the harassment is a prerequisite for liability" in co-employee harassment cases. Id. In assessing whether an employer had notice of sexual harassment, "we first determine whether the employer designated a channel for complaints of harassment." Id. Where an employer designates a "point person" to accept complaints, "'this person becomes the natural channel for the making and forwarding of complaints, and complainants can be expected to utilize it in the normal case.'" Id. (citation omitted). If a point person has not been identified, or is not easily accessible, "an employer can receive notice of harassment from a 'department head' or someone that 'the complainant reasonably believed was authorized to receive and forward (or respond to) a complaint of harassment.'" Id. (citation omitted). "With respect to the extent of the notice given to an employer, however, a plaintiff 'cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed.'" Id. (citation omitted).

Hall does not contend that Bodine was negligent in remedying Lopez's harassment of her on June 8, 1999--nor could she given his rapid termination by the company. She does, however, tangentially argue that Bodine was negligent in "discovering" Lopez's prior harassment of her (i.e., the conduct involving the rubber ball with spikes and inappropriate sexual comments) because it failed to implement an "effective" (i.e., published and widely distributed) sexual harassment policy. But we have never held that Title VII employers must institute formal sexual harassment policies. Instead, we have focused on whether an employer has a reasonable mechanism in place for "detecting and correcting harassment." Shaw v. Autozone, Inc., 180 F.3d 806, 812 (7th Cir. 1999), cert. denied, 528 U.S. 1076 (2000). See also Gentry v. Export Packaging Co., 238 F.3d 842, 847 (7th Cir. 2001) ("a sexual harassment policy must provide for 'effective grievance mechanisms'" and "should provide for a meaningful process whereby an employee can express his or her concerns regarding an individual within a working environment.") (citation omitted).

Bodine had an effective "channel" in place for Hall to report sexual harassment in the workplace. On three separate occasions, Hall complained that she had been sexually harassed. In each instance, she knew exactly whom to file a complaint with--her supervisor or the human resources department. Additionally, Bodine responded to her complaints by either disciplining or terminating the offending employee./7 Hall concedes that, prior to the filing of her June 9, 1999 complaint, she never notified Bodine that Lopez was harassing her, and she offers no satisfactory explanation on appeal for her failure to do so./8 Thus, while she claims that Bodine was "astonishingly unprepared to deal with problems of sexual harassment," we fail to see how a formal sexual harassment policy would have been any more effective than the mechanism the company already had in place, especially given Hall's unwillingness to report Lopez's conduct. Bodine was not only prepared to deal with sexual harassment, but effectively dealt with such behavior by addressing each of Hall's complaints in an effective and expeditious manner. An employer is not liable for co-employee sexual harassment when the victim, having a mechanism by which to report the harassment, fails to do so, and where the record is devoid of any credible evidence that the employer should have known that the harassment was taking place. Cf. Murray v. Chicago Transit Auth., 252 F.3d 880, 889 (7th Cir. 2001) (holding that an employee being sexually harassed by a supervisor must utilize any mechanisms her employer has in place for addressing complaints of sexual harassment).

Hall was sexually harassed by a co-employee, not a supervisor. Because Bodine promptly addressed the harassment upon being apprised of the behavior, the company may not be held liable for Lopez's conduct. As such, the district court's decision to grant Bodine's motion for summary judgment of this claim was appropriate.

C.  Hall's Claim of Retaliation

Title VII protects persons not just from certain forms of job discrimination, but also from retaliation for complaining about the types of discrimination it

prohibits. 42 U.S.C. sec. 2000e-3(a) ("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because [she] has opposed any practice made anunlawful employment practice by [Title VII]."). Hall argues that Bodine violated Title VII by firing her in retaliation for reporting Lopez's sexual harassment. She does not have direct evidence that it did so, and therefore proceeds under the McDonnell Douglas burden-shifting variant applicable to claims of retaliation. Miller v. American Family Mut. Ins. Co., 203 F.3d 997, 1007 (7th Cir. 2000) A prima facie case of retaliation is established under McDonnell Douglas when the plaintiff demonstrates: (1) she engaged in statutorily protected expression by complaining about discrimination that Title VII covers; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse job action. Id. If Hall establishes these elements, then Bodine has the burden of producing a legitimate, non-discriminatory reason for firing her. Id. If Bodine succeeds in doing this, Hall then has the burden of proving that Bodine's proffered reason is not true, but a mere pretext for retaliating against her. Id.

In reviewing the district court's disposition of Hall's retaliation claim, we will assume that she has made out a prima facie case, and move directly to the question of pretext. See, e.g., Rummery v. Ill. Bell Telephone, 250 F.3d 553, 556 (7th Cir. 2001). We do so not because we are convinced that Hall has established a prima facie case of retaliation, but because our analysis of that issue would substantially overlap with the question of pretext. See, e.g., Olsen v. Marshall & Ilsley Corp., 267 F.3d 597, 600-01 (7th Cir. 2001).

Bodine's articulated reason for terminating Hall is that she violated a company work rule regarding sexual harassment in the workplace. The company made this determination at the conclusion of an investigation of cross-complaints of sexual harassment made by Hall and Lopez against one another. Hall contends, however, that the investigation was a "sham" designed to fire her. She claims that this is so because the investigator,

Metz, failed to preserve the handwritten notes he made each day while interviewing witnesses, and misrepresented several of the witnesses' statements in his final report to the company. While we agree that, if true, this type of conduct could be enough for a reasonable jury to conclude that Bodine's proffered reason for termination was pretextual, the record does not support Hall's characterization of Metz's investigation.

We begin by noting the complete absence of any evidence of a pre-investigation animus between Metz and Hall./9 The lack of any previous hostility between these two individuals is a relevant consideration in evaluating whether Hall has met her burden of demonstrating that Bodine's proffered reason for terminating her was pretextual. This is especially true given her contention that Metz's characterization of her workplace behavior was based on a foundation of "lies and distortions."

The fact that Metz did not maintain his original handwritten investigation notes is not evidence of pretext. We have held that "[e]mployers are not required to keep every single piece of scrap paper . . . [created] during the termination process [and that] [i]t is sufficient that the employer retains only the actual employment record itself, not the rough drafts or processes which may lead up to it." Rummery, 250 F.3d at 558-59. See also Jeffries v. Chicago Transit Auth., 770 F.2d 676, 681 (7th Cir. 1985). Metz claims that he disposed of the original handwritten notes because: (1) they were "very rough," containing "shorthand, full of misspellings and cross-outs"; (2) the typed version substantively conveyed everything contained in the handwritten notes; and (3) for confidentiality reasons. We find all of these reasons to be entirely plausible. Because Hall offers nothing more than self-serving speculation, we conclude that Metz's failure to preserve his handwritten interview notes is not, in and of itself, evidence that his investigation was conducted in bad faith, or that Bodine's reason for firing her was pretextual.

Hall argues that Metz's animus towards her is demonstrated by the blatant distortions he made in his final report to the company. She claims that he

misrepresented several of the witnesses' statements, and omitted other statements from his report that would have cast her in a more positive light. After carefully reviewing each of the examples cited by Hall in support of this contention, we conclude that her allegation is little more than hyperbole. In fact, many of the deposition excerpts she references actually substantiate Metz's conclusion that Hall's workplace conduct was highly inappropriate.

Metz's final report contained summaries of each interview that he conducted over the course of his investigation. The report notes that eight of the sixteen witnesses Metz interviewed described the relationship between Hall and Lopez as mutually inappropriate. According to Metz, these witnesses stated that Hall and Lopez touched each other in a playful, sexual manner on numerous occasions, constantly told crude sexual jokes, and frequently made graphic sexual comments to one another./10 The report also notes that some of the male witnesses informed Metz that Hall had engaged in this same type of behavior with them as well./11 Hall claims that some of the incidents mentioned by these witnesses are either untrue, or have been taken entirely out of context. She does not, however, deny the overall allegation made by these witnesses--that she behaved inappropriately in the workplace./12 Instead, Hall argues that her workplace conduct, while inappropriate, does not amount to Title VII sexual harassment, and, therefore, Bodine "had no legitimate reason" to terminate her. She is mistaken. While Title VII protects victims of sexual harassment from being terminated in retaliation for reporting harassment, an employee's complaint of harassment does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior. Cf. Durgins v. City of East St. Louis, Illinois, 2001 WL 1443286, at *1 (7th Cir. November 16, 2001) ("An employer that finds during an investigation . . . that it should not have hired the person in the first place may decide to end the employment without any objection that this is 'retaliation' for the . . . complaint . . . .") (citation omitted).

Even if we assume that Hall's tawdry

conduct did not amount to Title VII sexual harassment, Bodine was still permitted to terminate her. In fact, the company's failure to do so would have most likely constituted a Title VII violation (i.e., sex discrimination against Lopez), as well as subjecting the company to future liability if another complaint of harassment was filed against Hall.

In conclusion, Hall offers no evidence that her termination was in any way connected to her complaint of Lopez's sexual harassment, or that Bodine's reason for firing her was pretextual./13 We, therefore, affirm the district court's decision granting Bodine's motion for summary judgment of this claim.

III.

Hall did not present sufficient evidence to defeat Bodine's motion for summary judgment of her claims. She was not able to use the continuing violation doctrine to recover for the pre-limitations period conduct forming the basis of her sex discrimination claim. Her claim for hostile environment sexual harassment was not cognizable because she was unable to demonstrate that Bodine was either vicariously liable for Lopez's actions, or negligent in discovering or remedying his sexual harassment of her. Finally, she was unable to demonstrate that Bodine's proffered reason for terminating her was pretextual. Because there were no outstanding issues of material fact remaining with respect to these claims, the district court properly granted Bodine's motion for summary judgment.

AFFIRMED.

FOOTNOTES

/1 Hall also claims that toward the end of 1994, she informed Conn that some of her male co-workers were refusing to help her lift heavy parts in the work area. This conduct ceased, however, after she reported the behavior to Conn.

/2 A "set-up operator" has the authority to assign machine operators to specific machines within a gearing cell.

/3 Hall made it clear at oral argument that her "interpretation"of Freeman is really nothing more

than a tacit invitation to this court to overrule Galloway, 78 F.3d at 1167, and to adopt and expand the "sufficiently related to" version of the continuing violation doctrine adopted by the Ninth Circuit. See, e.g., Morgan v. Nat'l R.R. Passenger Corp., 232 F.3d 1008, 1015-16 (9th Cir. 2000), cert. granted, 121 S. Ct. 2547 (U.S. June 25, 2001) (No. 00-1614) (permitting Title VII claimants, alleging an unlawful employment practice during the limitations period, to recover for pre-limitations period violations when they are "sufficiently related to" limitations period conduct, regardless of whether they were cognizant of the alleged discrimination at the time the violation occurred). We decline plaintiff's invitation, and stand by our decision in Galloway.

/4 While this court is not required to "'scour the record in search of evidence to defeat a motion for summary judgment,'" Ritchie v. Glidden Co., 242 F.3d 713, 723 (7th Cir. 2001) (citation omitted), we also found three other incidents, not specifically mentioned in Hall's appellate briefs, where she contends Bodine passed her over for advanced training positions in favor of male employees with less seniority and experience-- twice in 1996 and once in March 1997. Even were we to conclude that Hall did not become aware of Bodine's alleged discriminatory conduct until March 1997, her claim would still be untimely.

/5 Jerry Ptak was also a set-up operator during Hall's shift in the gearing cell, and he possessed these attributes as well. Hall concedes that Ptak provided her with advanced training.

/6 This is especially relevant with respect to Hall's complaints about Lopez's refusal to train her. Hall admits that she filed several complaints with Brian Kolka advising him of the situation. She also acknowledges that Kolka had the authority to correct the problem, and that he attempted, unsuccessfully in her opinion, to implement a system that promoted cross-training of all employees. This demonstrates that Hall viewed Kolka, and not Lopez, as her supervisor.

/7 In addition to Lopez's termination, Bodine disciplined Leroy Washington in 1998 for grabbing Hall's buttocks. Another employee, Ernie Bush, was terminated for calling Hall a "dumb ass bitch."

/8 Hall offers three reasons for failing to report Lopez's prior harassment of her. First, she claims that whenever the harassment occurred she would tell Lopez to stop it, and that afterwards he would not harass her for several weeks (only to resume the conduct again). Second, she con-

tends that this type of behavior was "simply part of the environment [that she] was working in." Third, she asserts that Bodine did not have a procedure for filing complaints of sexual harassment.

/9 On the contrary, the record suggests that Metz's conduct towards Hall was professional and courteous. For example, after the termination of Ernie Bush (see fn. 7), Metz escorted Hall in and out Bodine's facility for a week, out of a concern for her physical safety.

/10 Hezekehia Johnson told Metz that Lopez and Hall "played around with each other equally," that they were constantly "telling each other sexual jokes, patting each other on the buttock[s], and talking about their sexual deeds," and that Hall told him, on at least one occasion, that she was touching Lopez in an effort to get his penis hard. Kevin Ray told Metz that "he heard [Lopez and Hall] brag about their sexual exploits," and that Hall "would talk about the size of a man's penis, the number of times she had sex, the ways in which she had sex, and the number of people she had sex with."

/11 Jorge Santos told Metz that Hall approached him on the job and stated, "what about it [sic] if I turn off the light and we could go and do it on the table." Leroy Washington told Metz that while he and Hall were working together, she told him that she wanted to go out with him, and asked him, "when are we going to a motel?"

/12 Hall's attorney even concedes on appeal that "[t]here is some evidence that Hall and Lopez had a history of exchanging 'dirty jokes' or sexually oriented conversation."

/13 Hall's retaliation claim is further undermined by the weakness of her sex discrimination and sexual harassment claims. See Debs v. Northeastern Illinois Univ., 153 F.3d 390, 396 (7th Cir. 1998) (decision to reject retaliation claim was "bolstered" by weak evidence of discriminatory animus).